In Error — In Ejectment. —
On the trial of this ejectment, the jury found the defendant not guilty, and a bill of exceptions was filed. From which it appears that John Elliot died intestate in May, 1789, leaving George S. Elliot his only son and heir-at-law, who was born the 14th of February, 1788. A grant issued to the heirs of John Elliot, deceased, for 640 acres of land, dated the 27th of April, 1793. At January sessions, 1790, of the court for Tennessee county, David Johnson and George Oldham administered on the estate of John Elliot, and returned their inventory to the next April sessions. James Elliot brought, suit against the administrators, Oldham and Johnston, in January, 1791, at which time the letters of administration to Oldham and Johnston were repealed, and an administration was granted to Zilpha Elliot, the widow of John Elliot, deceased, and she was also appointed guardian to her infant children, George and Zebiah, and gave bond and security as guardian.
Whether the former administrators defended the suit brought by James Elliot does not appear by the record. The plea of pleneadministravit was pleaded at April, 1701. Afterwards at July sessions, 179.1, the same plea was put in, and on the trial docket was entered "jury sworn; say they find for the plaintiff, damages £163 16s." A fi. fa. issued against the goods and chattels, e., of John Elliot, deceased. c., reciting it to be for a debt James Elliot recovered against him. This was returned at October session "nothing found." An alias issued in the same form, on which was the *Page 140 
same return. At April sessions, 1792, "ordered that George Neville, Esq., be appointed guardian to George Simms Elliot, for the special purpose of receiving service of two scire facias; one at the instance of James Elliot against George Simms Elliot, as the heir-at-law of John Elliot, deceased, to show cause, if any he can, why execution should not be had of the real estate in his hands; the other at the instance of Robert Nelson against the said George Simms Elliot for a like purpose, and that he vested with full power to defend the same in behalf of the said George Elliot, heirs-at-law."Scire facias issued, commanding, c., to make known to George Neville, guardian of George S. Elliot, to show cause why execution should not be had of the real estate of the deceased in his hands. This was returned "made known to George Neville," and at July sessions, 1792, there was this entry of record: "James Elliot v. John Elliot's heir. Judgment according to scire facias." In January, 1793, James M'Carrol (who had intermarried with the administratrix some time in 1792), by a settlement with the County Court, was authorized to retain £61 4s. for expenditures and disbursements, during their administration, and certain persons: were appointed to value and set off to him property to that amount. In October, 1793, it was ordered by the Court that execution issue against the real estate of John Elliot, deceased, to satisfy the remaining part of the judgment, James Elliot v. John Elliot deceased's heir, Robert Weakly v. John Elliot deceased's heir, and also Robert Nelson v. John Elliot, deceased. And pursuant to order, a fieri facias issued commanding, c., that of the lands and tenements of John Elliot, deceased, you cause to be made the sum of £77 16s., being the balance due on a judgment obtained by James Elliot v. Elliot's' administrators. This execution was levied upon the land now in dispute, and sold by the sheriff to *Page 141 
James M'Carrol in January, 1793, for the sum of £10. The sheriff executed a deed to M'Carrol in 1804, who took possession in 1806, and has continued in possession ever since. On the 22d September, 1812, he sold and conveyed 190 acres to Blackmail, who afterwards conveyed his part to the defendant Hicks. They have been in possession ever since the dates of their purchases. On the 2d of January, 1816, George Simms Elliot sold and executed a deed to Patrick Darby, the lessor of the plaintiff, for the premises in question. George S. Elliot arrived at full age the 14th of February, 1809. The original writ in this cause was signed, attested by the clerk on the 12th of February, 1816, and was delivered to the lessor of the plaintiff, and was by him filled up on that day and was indorsed as having issued. But security for the prosecution of the suit was not given till the 4th of March following. The writ was put into the hands of the sheriff, and was executed on the 11th of April. It was also proved on the trial, that H.F. Bell, Robert Prince, and James Stuart were chosen by M'Carrol as administrator and guardian, and by George and Zebia Elliot, heirs and representatives, to adjust and determine a difference that had arisen between them, in which the heirs claimed damages in consequence of the alleged maladministration of M'Carrol. And they awarded that M'Carrol should pay $400 and convey 320 acres of land on White's Creek, for which he gave his bonds, and afterwards paid the money and made the deed. The arbitration was considered by the arbitrators, and by all parties, as extending to the whole estate, real and personal; but it does not appear that there was any bond of submission. All parties seemed satisfied with the decision, and the representatives gave M'Carrol a receipt, which was considered a final discharge from all further responsibility (but this receipt has not been produced). All parties, as well as the arbitrators, seemed to consider that the legal title to the *Page 142 
land was in M'Carrol, by the judgment, execution, and sale; and that there was no necessity of awarding a release of title, nor was any made. And the arbitrators say if they had believed at that time that the legal title was in the heir, they would not have awarded him to release it for that sum.
These are the facts, and it will save time at once to inquire whether, admitting a judgment given against one not served with process be void, a fieri facias issued upon it. and not superseded, but the sheriff proceeds to execute it by sale, shall be itself so absolutely void as not to protect the sheriff or vendee. For I think it must be admitted that, if the sheriff be protected, the vendee will be also. It would, indeed, be most unreasonable that the sheriff, commanded by solemn writ, issuing from a court, upon a subject within its cognizance, should for executing that writ be punished as a trespasser, because the plaintiff had caused an irregular judgment to be entered as the foundation of the execution, in which the sheriff neither had nor could have the least concern. It would be well enough to make the plaintiff answerable, but to make the sheriff so all the world would exclaim against as most impolitic and unjust. And is there any reason which would exempt the sheriff, that would not equally operate to exempt the vendee? To be sure, he is not obliged to purchase, as the sheriff is to execute the writ. But is he not equally justifiable in paying respect and giving credence to process issuing from a court having power to issue it on proper occasions? If every one must be satisfied that the judgment is not vacatable for irregularity before he dare purchase, who will be so imprudent as ever to purchase at an execution sale? Or if any one should purchase, will he be so imprudent as to give the value of the thing sold? Will he not take care to be indemnified against any contingency to which his purchase shall be exposed by invalidity of the judgment? The defendant may cause *Page 143 
such judgment to be set aside upon motion by the Court in which it is entered. If he do so before the fi. fa. is executed, he prevents the mischief of a seizure and sale. But if he do not procure it to be suspended in time, after he has suffered by a seizure and sale, he must look for redress to the plaintiff; who, upon reversal, will be obliged to restore to him all that he has lost, to be assessed by a jury in an action on the case if he choose to bring one or by a writ of restitution of the moneys raised by a. sale of his property if he choose to be satisfied with it. 4 Mod. 161; Salk. 587, 588. It is of no use. then, after a fi. fa. is executed for the defendant to say to the vendee. The fi. fa. under which you purchased was founded upon a void judgment. It is wholly useless to inquire whether a judgment be void for want of process' duly served. This can not affect the vendee, however available it may be made against the plaintiff. It follows that a judgment need not be shown by a vendee, though it must by the plaintiff if he be sued. Vide 5 Com. Dig. Pleader, 3 B. 7; 4 Mass. 612; 2 Caines, 255, 259. Vide, also, 12 Mod. 179; Ray. 73. A judgment need not be shown by the vendee in the case of personals (12 Mod. 179; Ray. 73); what is there in the nature of the thing to make it so in case of realty sold byfi. fa? If, after a judgment which binds the lands, the defendant sells, and then the execution issue, and the sheriff sells the same lands to another, the latter purchaser ought then to show the judgment in order that the fi. fa. by relation, and his deed under it may overreach the intermediate sale, but, in no other case, do I conceive the judgment to be necessary; unless where the property is conveyed in fraud of creditors, and sold by the sheriff under an execution against the vendor or donor. If a judgment were indispensable to the validity of a sale, then in case of reversal, after which no judgment could be produced, the sale would be void, then which nothing *Page 144 
is more untrue or more monstrous. For who would recompense the vendee; will the sheriff do it? He will be justified under the authority of his writ. Will the vendee sue the plaintiff? He will say to the vendee, I was no party to the judgment between you and the defendant to my action. My judgment against him is in full force, not vacated nor reversed and never will be so; for he, having recovered against you, can not move to set aside the judgment. He is satisfied. He is not entitled to any restitution against me. Will he sue the defendant? He will say, The judgment between the plaintiff and myself is in full force: and, moreover, he will say, You purchased without my request, and even against my wishes; your money has not come into my hands. Must he lose his money, then, that he paid to the sheriff and he to the plaintiff, and give up the property purchased to the defendant, after paying his debt to the plaintiff, and sit down under the loss? Far better would it be, and more honest, not to have any execution at all, than one drawing such consequences in its train; better nor act at all then to circumvent a deluded man by means of his confidence in judicial rectitude. The anonymous case in Salk. 588, evidently speaks of a restitution of money raised by a sale before the judgment set aside for irregularity, not a restitution of the property taken and sold. And, if so, what good will it do to show a judgment, for if void for irregularity the sale is good; if not void the sale is good? Can it be supposed that the vendee is the person meant in this case to be punished by attachment for not obeying the rule for restitution? Will he, who is not a party to the proceeding in which the judgment is set aside, be ordered to make restitution when the plaintiff, who is a party, and has the money raised by the sale, is passed over and left in the undisturbed possession of the money, whilst at the same time the vendee, a total stranger, is punished for the contempt? I think it will be conceded *Page 145 
after reflection, that the plaintiff is the person to be punished in case of non-restitution; and if so the authority of this case decides the question. Why is he proceeded against in this summary way, and not by sci. fa. Because he has behaved amiss, and has been called on to defend his conduct on the motion for setting aside the judgment. Would this reasoning apply to the vendee and show that he, too, could be proceeded against to take away his property upon a mere rule issued to him to give it up without further ceremony or resistance? Then he is not the person to be punished, but the plaintiff. Against him and not against the vendee is restitution to be made in case of setting a judgment aside for irregularity after the fi. fa. is executed. The vendee is safe whether the judgment be or be not set aside. If the judgment must be produced, and must appear to be one not void for irregularity or" for not serving process on the defendant, then suppose this case: the sheriff has returned executed; but the defendant in his action against the vendee offers to prove that the return of the sheriff was false, and that the defendant at the time of the supposed service, and long before and afterwards, was in France. Must this allegation be tried, and the judgment be declared void as between the defendant and the vendee, whilst it remains in force as between the plaintiff and the defendant? Or will this judgment, remaining unrescinded by the Court that rendered it, be considered as in force by all other courts where it may incidentally be questioned? If the latter, then how can the evidence of a false return by the sheriff be at all material? That should have been shown a priori to the court in which the judgment is. But if the false return shall be inquired into, then as between the plaintiff and defendant that return will remain conclusive; but as between the defendant and innocent vendee it has no conclusiveness at all; and the damages for a false return will fall not on the *Page 146 
sheriff who did the wrong, but on the vendee, who is wholly innocent of all immorality. This is the inevitable consequence of saying there must be a judgment produced by the vendee, which upon examination must appear to be one not void for irregularity or for not serving of the process. If it be conceded that the falsity of the sheriff's return shall not be established in this collateral way, then credence must be given to his return; and if so much reliance is placed upon his correctness, why not the same reliance upon the correctness of the clerk, that he will not issue an execution when not authorized to do so by the judgment? He, too, is sworn as well as the sheriff; given security for the performance of his duties; and may be sued, indicted, and removed from office for such an act. What more security can be had in any case? I cannot believe upon principal that it is requisite to produce a judgment not void, for these causes, except in such instances as are before enumerated. I will know, however that the practice has been in this State to produce the judgment to show, as some of the cases say, that the clerk has not issued the execution of his own head, not for the purpose of showing whether it be void or not. I have no reluctance to the continuance of the practice, as my brethren the other judges of this court seem strongly induced to adhere to it. It will, perhaps, be time enough to alter it when some plaintiff who has recovered and received a large sum from the vendee, and shall have gone to Europe or to Asia, and at the suit of the defendant against the vendee for the property purchased, the latter not able to produce a regular judgment, shall be compelled to resign the same to the defendant after paying for him the debt which he owed to the plaintiff, and be found incapable to obtain for himself any redress or relief. The actual occurrence of such a case will strike the observer with far more force than the contemplation of it as barely possible, and never likely really to turn up. *Page 147 
But, nevertheless, I will excuse myself from considering whether this be a void judgment or not for not being founded on process duly served on the defendant; without doing this I can consider of the execution, and of the authority communicated by it to sell the property in question. For if that were such as not to give such authority, then it is no fault of the law, but of the vendee himself to purchase that which the fi. fa. did not order to be sold. Look, therefore, to the fi. fa., and see whether it did or not authorize the sale of the property in question. If it did not, there is no hardship at all, nor any imputation upon the law, if he shall be compelled to relinquish it to the former owner. The sci. fa.
issued from April term, 1792. reciting a judgment obtained by James Elliot against John Elliot. It was against George Neville, guardian of George S. Elliot, heir of John Elliot; to show cause if any he had, why execution should not be had of the real estate of said deceased in his hands. Upon which this entry was made: "Judgment according to sci. fa." A fi. fa. issued commanding the sheriff that of the lands' and tenements of John Elliott, deceased, you cause to be made the sum, c., the balance due upon a judgment obtained against the said Elliot's administrators, c. What does this mean, "the lands of John Elliot deceased?"' Here is an execution against the property of a dead man; he can not have lands they belong to his heir or devisee. Does it mean lands which he had in his lifetime, and sold' or otherwise disposed of? It includes these, as well as it does the lands descended or devised. Does it mean the lands he had at his death, or those which he had in his lifetime? The term is so indefinite that it does not point out the lands descended to the heir. And if it did extend to them, does it mean lands the heir had, and parted with before the date of the sci. fa., or only those which remained undisposed of? If an execution issue against a testator in his lifetime, and he *Page 148 
die before the return day, it may be levied on his personalty. B. 3; P. W. 400. But if after his death such execution issue, it is wholly void; for the personal estate then belongs to the executors, and can not be reached by an authority to sell the goods of the testator. Vide Salk. 319; 5 Mod. 376. So here, a like execution to teste after the death of the ancestor, can not affect lands descended to the heir, and which have become his lands before the execution issues. In England it is every day's practice, if an obligor die in the vacation, to enter up judgment by virtue of a power given by the obligor as of the precedent term, at which time he was alive. and to issue execution against his goods, c. But if a term intervene, such execution can not issue; because then the teste of the execution must be of a term subsequent to his death, and can not affect the goods which have vested in the executor. 6 Term Rep. 368; 2 L. Ray. 769, 849; 2 Str. 882, 1081. So neither can an execution against his lands affect those which have gone by descent into the hands of his heirs. It is not slated in this execution who was the defendant; whether the heir, or Neville, the special guardian, or who else; but it says the debt to be satisfied is "the balance of a judgment obtained against the administrators by James Elliot." I am of opinion it communicated no power to the sheriff to sell the lands in question, and consequently that the sale is void. This leads directly to the act of limitations. The land was sold the 18th of January, 1794. A deed was made to M'Carrol the 12th of April, 1804. He conveyed to Russel, the defendant, on the 22d of September, 1812; and to John Blackman on the same day another part. In 1806, M'Carrol took possession; and on 14th of February, 1816, George Strums Elliot came of age. If the bar is to be formed by the lapse of seven years after the coming of age, which was in 1809, then the plaintiff is not barred; for the writ was issued from the office, *Page 149 
filled up, and indorsed two days before the seven years were completed. The Act of 1794, c. 1, sec. 9, directs he clerk or attorney to mark thereon the day it issued to the end, it is presumed, that the time mentioned in he let of limitations may be counted to that day. The time marked, therefore, is to be taken as the point to which a compute, unless that be proved not to be the true time. The clerk may issue process upon his own responsibility, without taking any security; when he does so the process is not therefore void, though he be liable to a penalty. That penalty is enough to secure the defendant. The law therefore avoided saying that the process should be nullified. It is good notwithstanding, and is deemed to have issued from the time it is marked. May not the plaintiff the next minute put it into the hands of the sheriff, and will it not justify the sheriff for all that he may do in pursuance of it? But from what point in this case does the computation commence? From the time the heir was ousted? and when was that? from the time that a stranger took possession and ousted his guardian, or from the time that the guardian ousted himself and could have been sued by the next friend as a tortious deforceor, and had done some, unequivocal act to demonstrate that he held for himself adversely to the ward. A resignation of the guardianship, and causing another guardian to be appointed, and keeping the possession from his adversary by preventing his entry, and denying the title of the ward, might amount to such an act. See 2 Leonard, 189; Littleton, sec. 57; 3 Ba. Ab. 418; Cro. J. 88; 1 Johnson's Cases, 213; 10 Johnson, 435; 3 Wilson, 516; 3 Cruise, 411; Dy. 291; 2 Leon. 147; 1 Sullivan, 240; 1 Plow. 293; 1 Leon. 232, 322; 1 R. Ab. 659; 3 Atk. 120; 1 P. W. 721. It is true, the guardian may purchase as well as any other at an execution sale against the ward's lands; but if he be disposed to take possession distinct from that of the *Page 150 
heir's possession, he must declare it by plain and distinct acts, not referable to any other intention. An action can not accrue to the ward otherwise than to make the guardion account, so long as he continues guardian; for in that character his possession embraces the land in question, and is a possession for the heir. If the guardian intends otherwise, that is secretly known to himself alone; and can not be known to others but by some open act demonstrative of his intention. Otherwise by purchasing in a bad title, adverse to that of the heir, he could, in spite of all opposition that the friends of the ward could make, acquire a good title to himself at the expense of the ward. If sued before the completion of the seven years, he would say I, as guardian, am entitled to this possession as well as for myself. I have two possessions, and one of them is certainly sufficient to protect me. After the seven years he would say: I will now claim by virtue of the possession under my own title. Let him give up the guardianship and claim for himself, become subject to the heir's action; and then it may be said he claims only for himself. And then it will follow that the possession which he keeps as guardian, can not by and by be used in destruction of the heir's title; than which nothing can be more compatible with sound principles. Shall the law encourage the protector to become the destroyer? and him to be the usurper of the infant's possession who was intrusted to keep it against all the world, and to deliver it to him unimpaired in due season? Who is safe where such infidelity receives countenance? and under such a system, who can say that the lamb is not committed to the wolf? I am of opinion that the time, in this case, began to run from the death of the mother when the guardianship ended; and if that was after the coming of the heir to age, then from the time of his coming to the age of twenty-one years. *Page 151 
As to the arbitration, it is believed to be an estoppel, where it is by writing under seal, and directly comprehends the subject-matter of the ejectment in which it is afterwards used. In such a case as the present, it deserves no favor, and should be deemed exclusive of objects not clearly included. Settlements with young heirs, just after coming of age. before they have acquired information enough of their affairs to enable them to act with discretion, are much discountenanced in equity, and oftentimes disallowed, 1 Vesey, 381, and for the same reason ought not to be encouraged in courts of law. If the lessor of the plaintiff be not estopped, all will admit that an award can not transfer the freehold. It is further to be remarked that, in this country, the ejectment is for the recovery of the possession and the right of property. The authorities referred to, 3 East, 16, and others, do not say that an award can estop in actions for the freehold on mere right. The award, I think, is not an obstacle to the plaintiff's recovery, as this case is circumstanced.
I wish to be understood' that the deed to M'Carrol, though founded on a void sale, and therefore not derived regularly under the grant in the name of Elliot, the ancestor, is yet as capable of confirmation by lapse of time, under the act of limitations, as any other invalid deed. The ground I go upon is, that there is not in this case time enough for its confirmation, there not having been seven years' adverse possession before the commencement of the action. The time ought to be counted' from the first act. which unequivocally announced a possession adverse to the heir; and that, in the present case, may be not till after the lands were sold to Blackmore and the other defendant. When a sale is made of lands in this country by the sheriff, like that of a leasehold in England, the possession is not altered, but it must be sued for and recovered by the purchaser, or otherwise legally acquired. It *Page 152 
remains as it was at the time of the sale until some clear act be done to change it in favor of the purchaser.
With respect to the other matters discussed in this cause, there is no necessity for instituting any minute investigation. A verdict in 1791 and 1792, when the old mode of doing business prevailed, may be taken for a judgment, and sales made under an execution issued upon it be deemed valid. Also a judgment upon the trial docket entered up thus, "judgment according to sci. fa.," will be, as effectual as one entered with the same formality with which judgments are now entered. Infinite mischief would follow the disallowance of them and of the proceedings upon them. I believe that in the case of asci. fa. against lands in the hands of an infant heir, the Court have no power to appoint a special guardian where their is a general one regularly appointed, who has given bond and performed the other requisites presented by law, and that a judgment founded upon such special appointment is reversible. I believe, also, that suchsci. fa. ought to be founded upon the plea of fully administered, found for the executor or administrator, or that the judgment-founded upon it is reversible. And though as between a plaintiff and administrator, whose letters are repealed after the action commenced against him, that if he will not plead the repeal he can not afterwards avail himself; yet as between the plaintiff and him such judgment ought to be against the real administrator. Otherwise how can. he be in court to contest with the heir concerning the plea of fully administered when the heir is brought in by sci.fa.? Before there can be an inquiry respecting the personal estate and its sufficiency, the real administrator must be present, and how is that to be brought about: unless he be retained in court till the heir come in Can he be brought in by sci. fa. or other process? none is given by the act. for such a case was not supposed. In this case, it was not understood at the time *Page 153 
of the judgment against the administrator whether the latter or the former were considered defendants, or that the judgment was. upon the plea of fully administered, found for the defendant. For then the judgment would have been to recover the debt, but not out of the assets, there being none in the hands of the administrator, because he had discharged himself of assets but to be levied of the real estate of the heir if the heir had real assets. This, perhaps, is the proper form in such cases. It is a new one introduced by the Act of 1784, c. 11, for at the common law the defendant on administration, upon the plea of fully administered found for him, would have been discharged by an est inde sine die, and judgment would have been given against the plaintiff, but now judgment is to be entered for the plaintiff, to be levied the act does not say how. but the heir is to show cause why execution should not issue against the real estate for the amount of such judgment, c. Execution of what? I suppose of the judgment signed by the plaintiff. The judgment upon the sci.fa. is, that the plaintiff have execution of the judgment against the real estate. In the present case two writs of sci. fa.
issued, which could only be for the purpose of procuring satisfaction out of the personal estate. It was therefore considered that the personal estate in the hands of the administrator was liable. All this preceded the sci. fa. The judgment upon it is reversible; for it subjected the real estate when the keeper of the personal found the real administrator had not been before the Court by any thing distinctly asserted upon this record. Judgment according tosci. fa. means according to the statements in the sci.fa., and taking them all to be true. The sci. fa. in this case recited a judgment by James Elliot against John Elliot, deceased, and stated the object to be, to have execution of the real estate of the deceased in the hands of Neville, guardian of George S. Elliot, heir of John Elliot. Judgment then was against *Page 154 
Neville, guardian of George S. Elliot, heir of John, of the lands in the hands of Neville. And these lands were not in his hands, but in the hands of the general guardian. Moreover, this judgment was founded upon one against John Elliot, deceased, passing over the personal estate in the hands of the administrator. But this is not a void judgment. Judgments may be void for want of jurisdiction in the court, of which all the world may take advantage, or for irregularity, of which the party injured only can take advantage, which he must do in time to prevent injustice to third persons. If it could be established that the judgment against the real estate in the case before us was void for the latter cause, it would not vitiate the sale made under an execution issued upon it. The defendant ought to have caused it to be superseded before a sale was made, and not having done so. he must now look to the plaintiff, and get reimbursement from him. But indeed it is useless to dwell upon these several points; for though they have been brought forward in the argument of this cause, yet they do not enter into the merits thereof, nor form any material part of it.
I am of opinion that the judgment ought to he reversed, and the cause to be remanded to the Circuit Court, to be tried de novo.